Filed 8/22/16  In re Christopher T. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re CHRISTOPHER T., a Person Coming Under the Juvenile Court Law. | B265596 |
| | (Los Angeles County Super. Ct. No. CK83863) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>CLARK T. et al.,<br><br>        Defendants and Appellants. | |

        APPEAL from an order of the Superior Court of Los Angeles County, Julie Fox Blackshaw, Judge.  Affirmed.

        Pamela Deavours, under appointment by the Court of Appeal, for Defendant and Appellant Clark T.

        Maryann M. Goode, under appointment by the Court of Appeal, for Defendant and Appellant Sherry A.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, Kim Nemoy, Principal Deputy County, for Plaintiff and Respondent.

_____

Sherry A. and Clark T., the mother and presumed father of now-seven-year-old Christopher T., appeal the juvenile court's July 6, 2015 order pursuant to Welfare and Institutions Code section 366.26[1] terminating their parental rights and identifying adoption as the permanent plan for Christopher.  Clark contends the juvenile court erred in ruling he had failed to establish the parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)).  Sherry contends the court and the Los Angeles County Department of Children and Family Services (Department) failed to comply with the inquiry and notification requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Removal of Christopher and the Provision of Reunification Services*

Dependency proceedings were initiated on August 31, 2010 after Christopher fell down a flight of stairs in the family home while under Sherry's supervision.  On December 1, 2010 the juvenile court sustained an amended petition under section 300, subdivision (b) (failure to protect), finding two-year-old Christopher was at risk of serious physical harm due to Sherry's long history of substance abuse (prior methamphetamine abuse and current alcohol abuse), which interfered with her ability to provide appropriate care for the child; Sherry's failure to follow through sufficiently with Christopher's medical and developmental needs (subsequent medical evaluations disclosed symptoms consistent with spina bifida and fetal alcohol syndrome); and Clark's failure to intervene to protect Christopher from the dangers created by Sherry's alcohol abuse while he, Sherry and Christopher resided together.  The court removed Christopher

---

[1]    Statutory references are to this code unless otherwise stated.

2

from the custody of Sherry and Clark, ordered the Department to provide them with reunification services and limited the parents to monitored visitation.

At the six-month review hearing (§ 366.21, subd. (e)) in May 2011, the court found Sherry and Clark were only in partial compliance with their case plans and ordered additional reunification services. Clark's individual therapist had previously reported to the Department that Clark was in denial about Sherry's substance abuse, Christopher's developmental delays and the reason the Department and the juvenile court had intervened in the family's life; the therapist recommended a mental health assessment, in part, to consider Clark's anger management issues. At the hearing the court ordered mental health evaluations for both parents and for Christopher pursuant to Evidence Code section 730.

Following the Evidence Code section 730 assessment ordered by the court, the evaluator concluded, while the parents were engaging and affectionate with Christopher, they were overwhelmed by his diagnosis of spina bifida and possible fetal alcohol syndrome and needed help understanding and accepting his special needs. At a progress hearing two months after the six-month review hearing, the court permitted Sherry and Clark to have unmonitored visits with Christopher, jointly or separately, two times a week for a minimum of three hours per visit.

By the time of the 12-month permanency hearing (§ 366.21, subd. (f)) in November 2011, Sherry and Clark were allowed overnight visits with Christopher, provided Clark was present during the visit. Prior to the hearing the Department held a team decision meeting to consider the possibility of returning Christopher home. However, at the meeting Sherry repeatedly denied she had a drinking problem or that she had been drinking when Christopher was injured. Clark continued to work from 4:00 a.m. to 11:00 a.m. as a maintenance employee at McDonalds, creating an on-going issue of Christopher's safety when he was not there. (The paternal grandmother, who was an alcoholic, also resided in the home with Sherry and Clark.) The Department recommended that Clark move to a safe home so Christopher could be returned to his

3

custody. At the 12-month hearing the court ordered the Department to provide further reunification services and increased the number of permitted weekly visits.

Prior to the 18-month permanency review hearing (§ 366.22) the Department reported that Clark had complied with all court orders but Sherry had failed to participate consistently in drug and alcohol testing and tested positive for alcohol in February 2012. Because of concerns about overnight visitation with two alcoholics (Sherry and paternal grandmother) in the home, the court ordered monitored visitation until it was confirmed that Clark was no longer living with Sherry. The Department recommended termination of reunification services for both Sherry and Clark. However, after Clark moved to a new residence, his visits with Christopher were again modified by the court to permit unmonitored visitation. The 18-month permanency review hearing was continued to July 2012 and again to mid-August 2012 for a contest.

2. *The Section 342 Subsequent Petition and Termination of Reunification Services*

On July 22, 2012—two days after the mass shooting during a midnight screening of *The Dark Knight Rises* in Aurora, Colorado—Clark was arrested for making criminal threats inside a movie theatre showing the same film. Clark threatened to "go off like Colorado" and asked other patrons whether they had a gun. The Department filed a supplemental petition (§ 342) on July 27, 2012, alleging that Clark's "violent threatening behavior" endangered Christopher's physical health and safety and placed him at risk of serious physical harm. The Department reiterated its prior recommendation for termination of family reunification services for both parents and asked that visitation with Christopher be monitored for Clark, as well as Sherry.

Clark was released from custody on September 12, 2012. He immediately resumed counseling and monitored visits with Christopher. Clark was subsequently convicted of a misdemeanor, placed on three-year summary probation and ordered to complete a 25-week anger management program.

At a combined section 366.22 and section 342 hearing on October 3, 2012, the court terminated family reunification services and set a selection and implementation

4

hearing (§ 366.26) for January 29, 2013. Monitored visitation by both parents (separately) with Christopher was to continue at least two times per week. The court deemed the section 342 petition moot.[2]

### 3. *Reinstatement of Clark's Reunification Services*

Prior to the selection and implementation hearing Clark petitioned for reinstatement of reunification services (§ 388). After several continuances and following a contested hearing in June 2013, the court granted the petition and ordered six months of additional services for Clark. The court acknowledged that the foster parents who had been caring for Christopher for two years wanted to adopt him and had an approved home, but felt there was little likelihood that opportunity would be lost if Clark failed to reunify with the child during the additional reunification period. The court also noted the foster mother had candidly described not only her own difficulties dealing with Clark but also Christopher's obvious affection for his father. Based on the evidence presented at the hearing, the court observed that Clark might well be suffering from frontal lobe damage (perhaps due to fetal alcohol syndrome) that could be the cause of his lack of impulse control. The court directed a neuropsychological assessment be performed and concluded Clark deserved a chance "to make one final effort to see if the issues that brought us here can be ameliorated and Christopher can be returned to the care and custody of his father."

In early August 2013 the superior court issued a restraining order against Clark at the request of Sherry's boyfriend, who alleged Clark had told him he was going to pay someone to beat him up/kill him, followed him in his car, and threw a can of beer at him while he was waiting at a bus stop. As reflected in a status review report filed on January 27, 2014 by the Department, Clark, now homeless and unemployed, continued to

---

[2] Both Sherry and Clark challenged the order setting the selection and implementation hearing by petitioning this court for extraordinary writ relief (case no. B244492). The petitions were dismissed as inadequate after their attorneys filed letters indicating there were no viable issues.

visit with Christopher twice each week for one hour.  Clark told the social worker he was not well and could not keep up with Christopher.  In meetings with the Department Clark acted erratically and emotionally, angry one moment, crying over his failed relationship with Sherry the next.  In June 2014, after Clark had received a full year of renewed reunification services, the court again terminated reunification services, confirmed Christopher's placement with the foster family and scheduled a selection and implementation hearing for October 14, 2014.[3]  That date was continued several times, and a contested hearing was finally held on July 6, 2015.[4]

4. *The Section 366.26 Hearing:  Termination of Parental Rights and Identification of Adoption as Christopher's Permanent Plan*

In an interim review report submitted to the court on March 16, 2015, the Department indicated Clark was still unemployed but was now living in the home of childhood friends.  According to the report, Clark was inconsistent in his participation in drug testing, attendance at Al-Anon meetings and parenting programs.  In addition, because of Christopher's on-going developmental and medical needs, the child required consistent help from a caregiver available to take him to, and participate in, medical appointments, school meetings and regional center services appointments, as well as to administer and monitor his medication.  Yet Clark insisted that there was nothing wrong with Christopher and that he acted delayed only because he was living in a foster home where there was also a child who had been diagnosed with Down Syndrome.  In addition, Clark did not have a childcare plan for Christopher if the child were to be returned to his care.  Although the Department acknowledged Clark loved his son, based on its overall

[3]     Sherry and Clark again petitioned for extraordinary writ relief (case no. B257195), and this court again dismissed the petitions after counsel filed letters indicating there were no viable legal arguments.

[4]     In addition to the contested section 366.26 hearing, on July 6, 2015 the juvenile court heard and denied separate petitions pursuant to section 388 filed by Sherry (on October 27, 2014) and Clark (on January 14, 2015) seeking additional reunification services or, alternatively in Clark's petition, the return of Christopher to his custody.  The parents' briefs on appeal do not challenge the denial of these section 388 petitions.

assessment of Christopher's special needs and Clark's abilities, the Department concluded Clark was not capable of caring for Christopher and did not believe it was in the child's best interest to reunite with his father.

At the March 16, 2015 hearing—one of the dates set for the section 366.26 hearing that was ultimately continued—the court appointed Dr. Chuck Leeb to evaluate the relationship bond between Clark and Christopher, as well as between Christopher and the foster parents with whom he had been living and who were prepared to adopt him, and to assess the perceived negative effects if the relationship between Clark and Christopher was terminated (a "bonding study"). In his report submitted to the court on May 14, 2015, Dr. Leeb noted that Clark had admitted he was an alcoholic and had previously used cocaine and marijuana, asserted that he had "quit before," and stated, "Christopher is my new drug. My new alcohol." Dr. Leeb confirmed it was Clark's view that Christopher did not have special-needs and was exhibiting developmental delays only because he was imitating the special needs child in the foster home where he was placed. Dr. Leeb concluded that Clark had not demonstrated he was capable of providing for Christopher's well-being and his disregard for medical advice concerning Christopher's needs suggested he was not able to do so. In addition, Clark's statement concerning Christopher as his new drug could be seen as evidence Clark needed Christopher to make him whole: "Father's level of narcissism does not allow him to be flawed and therefore Christopher cannot be seen as having flaws. Father needs to blame others rather than accept the reality." Dr. Leeb observed a positive interaction between Clark and Christopher when they were together, but noted it was "devoid of any decisions of consequence. The interaction is more like a 'play date.'" With respect to termination of the relationship, Dr. Leeb opined, "Minor will miss father for awhile but [will] not be devastated by the loss."

On June 16, 2015 Clark's counsel notified the court that Dr. Alfredo Crespo had been retained to conduct an additional bonding study; and, at counsel's request, the court ordered the Department to facilitate Dr. Crespo's evaluation. Dr. Crespo's report, dated

June 29, 2015, was received into evidence by the juvenile court at the contested hearing on July 6, 2015. As part of his evaluation of Clark, Dr. Crespo administered the Minnesota Multiphase Personality Inventory -2 and two other psychological tests. Dr. Crespo wrote, "[S]imilar MMPI-2 results are often found among individuals with a history of acting out in unsocialized, aggressive and sometimes even bizarre ways (such as may be exemplified by the movie theatre incident in his history). . . . They usually have a substance abuse history associated with poorly thought out behaviors underlying a pattern of uneven achievement also often found among them."

According to Dr. Crespo, "Though the father presented relatively well during the present evaluation, his history and current test results raise obvious concerns about his parenting capacity. These very same concerns undermine his expressed commitment to reunify with his son . . . ." With respect to the potential adverse consequences of terminating the father-son relationship, Dr. Crespo agreed with Dr. Leeb that "the minor may experience short-term distress if adopted by his caregivers. However, given the minor's relationship with his father for almost three years has been limited to visits, the intensity of the loss may be predicted to be manageable through supportive family counseling . . . ."

Clark testified at the contested hearing on July 6, 2015, and the court considered the reports and recommendations from Dr. Leeb and Dr. Crespo, as well as the several reports (with attachments) the Department had prepared for the hearing. (Although Christopher was called to testify in chambers, he would not answer any questions.) During his testimony Clark appeared to acknowledge that Christopher was a special-needs child but still insisted his condition was aggravated by being placed in a home with another special-needs child and stated he should be treated like a "normal" child. Clark described his consistent, twice-a-week visits with Christopher, his daily telephone calls with his son and their affectionate relationship. Clark believed Christopher would be crushed if their visits ended.

After considering the reports and testimony, as well as the arguments of counsel, the court found by clear and convincing evidence that Christopher was adoptable and that it would be detrimental to the child to be returned to his parents.  The court additionally found that no exception to adoption applied.  Accordingly, the court terminated Sherry's and Clark's parental rights and transferred Christopher's care, custody and control to the Department for adoptive planning and placement.  The court explained, although it was apparent that Clark loved Christopher very much, its task was not to assess the detriment to Clark, but to the child:  "And it is clear to me that [Clark] needs Christopher more than he needs his father."  The court recognized that Clark and Christopher had frequent contact but found "the quality of the visits [was] really, as Dr. Leeb has said, like play dates.  Christopher enjoys your company, but the role was not terribly parental.  And the emotional attachment between you, again, I believe really goes very much more in one direction, from you to Christopher, than back again."  The court also emphasized that neither Dr. Leeb nor Dr. Crespo believed Christopher would suffer any long-term detriment as a result of the termination of his relationship with Clark; and the court itself believed that the long-term care, support and stability that will result from adoption "far outweighs any short-term emotional reaction that he will have."

5. *Investigation of Indian Ancestry and ICWA Notice*

In the initial detention report dated August 31, 2010, the Department stated ICWA "does or may apply," explaining that Sherry had stated in an interview she has Cherokee and Muscogee [misspelled "Maskobi"] in her family although the family was not "registered"; Clark stated his family did not have Indian ancestry.  On September 8, 2010 Clark filed the mandatory Judicial Council form ICWA-020 stating he had no Indian ancestry as far as he knew.  Sherry, however, stated on her ICWA-020 form, filed the same date, that she may have "Cherokee, Creek, Mascogee [*sic*]" ancestry.[5]  According to the minute order from the arraignment hearing held on September 8, 2010, the juvenile

_____

[5]     The Muscogee (Creek) Nation is a federally recognized tribe.  (See 9 Fed.Reg. 5019-5025 (Jan. 29, 2016).)

9

court ordered the Department to give notice of the dependency proceedings to the Cherokee, Creek and Muscogee tribes.[6]

In the jurisdiction/disposition report dated October 13, 2010, the Department advised the court that Sherry had informed the dependency investigator that she was Muscogee (Creek) and provided a family tree she was using as part of her application for enrollment in the tribe. Sherry explained the information on the family tree was all the information she had regarding her Indian ancestry. Based on this material the Department sent certified mail notice of the proceedings to The Muscogee (Creek) Nation of Oklahoma, the Bureau of Indian Affairs and the Department of the Interior with biographical data for Sherry's lineal ancestors. The report does not indicate whether Sherry was specifically asked about her earlier statement concerning possible Cherokee ancestry or whether there were maternal relatives who might have additional information about the family's ancestry.

By the time of the continued jurisdiction/disposition hearing, The Muscogee (Creek) Nation stated Christopher was not an Indian child within the meaning of ICWA based on the information provided. The Department of the Interior and Bureau of Indian Affairs confirmed receipt of the ICWA notice and checked the line stating no response or action was required: "The county has provided an appropriate notice to the tribe or tribes." At a status hearing on December 6, 2010, the court found that ICWA did not apply to this case.

At the section 366.26 hearing on July 6, 2015 the court stated it wanted to be sure all the appropriate ICWA findings had been made. Counsel for the Department stated a no-ICWA finding had been made on December 6, 2010, but explained he did not have that volume of his court file with him, so he was unsure of the basis for the finding. No

_____

[6] The record on appeal does not contain a reporter's transcript from the arraignment hearing.

10

other party made any comment regarding the earlier finding.[7] The court observed that the December 2010 finding had been made by a prior bench officer and said, "I am certain that the court went through all of the necessary steps to make an appropriate finding."

## DISCUSSION

1. *The Juvenile Court Did Not Err in Ruling Clark Had Failed To Establish the Parent-child Relationship Exception to Termination of Parental Rights*

a. *Governing law and standard of review*

Section 366.26 governs the juvenile court's selection and implementation of a permanent plan for a dependent child. The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) Once the court has decided to end parent-child reunification services, the legislative preference is for adoption. (§ 366.26, subd. (b)(1); *In re S.B.* (2009) 46 Cal.4th 529, 532 ["[i]f adoption is likely, the court is required to terminate parental rights, unless specified circumstances compel a finding that termination would be detrimental to the child"]; *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["[I]f the child is adoptable . . . adoption is the norm. Indeed, the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child."]; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [once reunification efforts have been found unsuccessful, the state has a "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody" and the court then must "concentrate its efforts . . . on the child's placement and well-being, rather than on a parent's challenge to a custody order"]; *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1299-1300; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1163.)

---

[7] In Dr. Crespo's bonding study, which was before the court at the section 366.26 hearing, Clark was quoted as stating Sherry was "Native American. . . . I don't [know] what Tribe." As far as Clark knew, Sherry was not a "'registered' member of a Tribe," but "her dad and her sister are Registered American Indians."

11

Section 366.26 requires the juvenile court to conduct a two-part inquiry at the selection and implementation hearing.  First, it determines whether there is clear and convincing evidence the child is likely to be adopted within a reasonable time. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250; *In re D.M.* (2012) 205 Cal.App.4th 283, 290.)  Then, if the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of the enumerated statutory exceptions applies.  (§ 366.26, subd. (c)(1)(A) & (B); see *Cynthia D.,* at pp. 250, 259 [when child is adoptable and declining to apply one of the statutory exceptions would not cause detriment to the child, the decision to terminate parental rights is relatively automatic].)

One of the statutory exceptions to termination is contained in section 366.26, subdivision (c)(1)(B)(i), which permits the court to order some other permanent plan if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  The "benefit" prong of the exception requires the parent to prove his or her relationship with the child "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'"  (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643; accord, *In re Amber M.* (2002) 103 Cal.App.4th 681, 689; see *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer"].)

A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption.  (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 466 ["[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent"].)  No matter how loving and frequent the contact, and notwithstanding the

existence of an "'emotional bond'" with the child, "'the parents must show that they occupy "a parental role" in the child's life.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.) Factors to consider include "'[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs.'" (*In re Marcelo B., supra,* 209 Cal.App.4th at p. 643.)

The parent has the burden of proving the statutory exception applies. (*In re I.W., supra*, 180 Cal.App.4th at p. 1527; *In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) The court's decision a parent has not satisfied this burden may be based on either or both of two component determinations—whether a beneficial parental relationship exists and whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); see *In re K.P., supra*, 203 Cal.App.4th at p. 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) When the juvenile court finds the parent has not established the existence of the requisite beneficial relationship, our review is limited to determining whether the evidence compels a finding in favor of the parent on this issue as a matter of law. (*In re I.W.*, at pp. 1527-1528.)[8] When the juvenile court concludes the benefit to the child derived from preserving parental rights is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption, we review that

---

[8] Because the juvenile court's factual determinations are generally reviewed for substantial evidence, it has often been posited a challenge to a finding that no beneficial relationship exists is similarly reviewed for substantial evidence. (See, e.g., *In re Bailey J., supra,* 189 Cal.App.4th at p. 1314; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) The parent's failure to carry his or her burden of proof on this point, however, is properly reviewed, as in all failure-of-proof cases, for whether the evidence compels a finding in favor of the appellant as a matter of law. (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1163; *In re I.W., supra,* 180 Cal.App.4th at pp. 1527-1528; see *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 ["where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"].)

determination for abuse of discretion. (*In re K.P.*, at pp. 621-622; *In re Bailey J.*, at pp. 1314-1315.)

> b. *The juvenile court did not abuse its discretion in concluding the long-term benefits of adoption for Christopher outweighed any short-term detriment from the termination of his relationship with Clark*

As all parties and the juvenile court acknowledged, Clark maintained regular visitation with Christopher during the five years this dependency case has been pending; and Christopher plainly enjoyed his visits with his father. For that reason, the court extended reunification services on several occasions, giving Clark ample opportunity to reunify with his son. Nonetheless, based primarily on Dr. Leeb's expert evaluation, the court found the quality of those visits did not rise to the level of a "parental relationship," as required to establish the subdivision (c)(1)(B)(i) parent-child exception to adoption. On this record, we cannot say the evidence before the juvenile court compelled a finding on this point in favor of Clark as a matter of law. Accordingly, for this reason alone, the juvenile court's ruling must be affirmed. (See *In re I.W.*, *supra*, 180 Cal.App.4th at pp. 1527-1528.)

Even if we were to accept Clark's contention that he proved he enjoyed a beneficial parental relationship with Christopher, however, based not only on Dr. Leeb's evaluation but also on the assessment of Clark's own expert, Dr. Crespo, concerning the potential impact of terminating Christopher's relationship with his father, the juvenile court did not abuse its discretion in concluding the long-term benefits of adoption for Christopher outweighed any short-term detriment he might suffer. Unlike *In re S.B.* (2008) 164 Cal.App.4th 289, cited by Clark, in which the appellate court found the parent-child exception had been established, Christopher has spent most of his life with his current foster parents (since February 2011); and Clark was not his primary caregiver during the first two years of his life prior to his removal from Sherry and Clark's custody. (Cf. *In re Jason J.* (2009) 175 Cal.App.4th 922, 937 [explaining the court's earlier opinion in *In re S.B.* "does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in

14

continued contact between parent and child"].)  In addition, the juvenile court properly weighed in the balance Christopher's special needs, Clark's steadfast refusal to acknowledge them, the foster family's experience with special-needs children and its willingness to adopt Christopher, and the experts' opinions that Clark was unable to do provide the care Christopher required.  In light of all these factors, the court acted well within its discretion in ordering termination of parental rights and identifying adoption as Christopher's permanent plan.

### 2. *The Department and the Juvenile Court Satisfied Their Obligations Under ICWA*

#### a. *The ICWA investigation and notice requirements*

ICWA reflects a congressional determination that it is in the best interests of Indian children to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations.  (25 U.S.C. § 1902; *In re Isaiah W.* (2016) 1 Cal.5th 1, 8; see *In re H.G.* (2015) 234 Cal.App.4th 906, 909-910; *In re Alexandria P.* (2014) 228 Cal.App.4th 1322, 1355-1356; see also § 224, subd. (a).)  It is intended to protect Indian children and to promote the stability and security of Indian tribes and families. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 173-174; see also *In re Suzanna L.* (2002) 104 Cal.App.4th 223, 229.)  For purposes of ICWA, an "Indian child" is a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.  (25 U.S.C. § 1903(4); see § 224.1, subd. (a) [adopting federal definitions].)

ICWA provides, "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and its right to intervene.  (25 U.S.C. § 1912(a).)  Similarly, California law requires notice to the Indian custodian and the Indian child's tribe in accordance with section 224.2, subdivision (a)(5), if the Department or court knows or has reason to know that an Indian child is involved in the proceedings.  (§ 224.3, subd. (d).)  The circumstances that may

provide reason to know the child is an Indian child include, without limitation, when a member of the child's extended family provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's parents, grandparents or great-grandparents are or were a member of a tribe.  (§ 224.3, subd. (b)(1); see *In re Isaiah W., supra*, 1 Cal.5th at p. 15 ["section 224.3, subdivision (b) sets forth a nonexhaustive list of 'circumstances that may provide reason to know the child is an Indian child'"]; see also *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1386-1387 & fn. 9 [because only the tribe may make the determination whether the child is a member or eligible for membership, there is no general blood quantum requirement or "remoteness" exception to ICWA notice requirements]; *In re B.H.* (2015) 241 Cal.App.4th 603, 606-607 ["a person need not be a *registered* member of a tribe to be a member of a tribe—parents may be unsure or unknowledgeable of their own status as a member of a tribe"].)

Juvenile courts and child protective agencies have "an affirmative and continuing duty" to inquire whether a dependent child is or may be an Indian child.  (*In re Isaiah W., supra*, 1 Cal.5th at p. 9; § 224.3; Cal. Rules of Court, rule 5.481.)  As soon as practicable, the social worker is required to interview the child's parents, extended family members, the Indian custodian, if any, and any other person who can reasonably be expected to have information concerning the child's membership status or eligibility.  (§ 224.3, subd. (c); *In re Shane G.* (2008) 166 Cal.App.4th 1532, 1539; Cal. Rules of Court, rule 5.481(a)(4).)

b.  *Notice to The Muscogee (Creek) Nation was adequate*

The ICWA notices sent to The Muscogee (Creek) Nation on October 5, 2010 and October 26, 2010 contained Sherry's name, address, birthdate and place of birth, and the names of Christopher's maternal grandmother and grandfather, maternal great-grandmother and maternal great-great grandmother, and indicated that the maternal great-great grandmother, Bessie S., was listed on the tribe's 1906 final roll.  Challenging the sufficiency of these notices, Sherry explains her Indian ancestry descended through her

maternal grandfather, not her maternal grandmother as reflected on the Department's notices. She also criticizes the failure of the notices to include the names of three other possible relatives who were listed in the material she provided the social worker. Sherry acknowledges "[e]xactly who these relatives were and how they were related to Christopher was unknown," but contends the Department should have interviewed the maternal grandparents or other maternal relatives to determine whether additional information was available.[9]

Sherry's argument is without merit. Section 224.2, subdivision (a)(5)(C), requires ICWA notice to a tribe to include "All names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married and former names or aliases, as well as their current and former addresses, birthdates, places of birth and death, tribal enrollment numbers, and any other identifying information, if known." California Rules of Court, rule 5.481(a)(4)(A) directs the social worker to conduct interviews "to gather the information listed in Welfare and Institutions Code section 224.2(a)(5), . . . which is required to complete the *Notice of Child Custody Proceeding for Indian Child* (form ICWA-030)." The Department complied with these obligations, sending The Muscogee (Creek) Nation all available information regarding Christopher's parents, maternal (and paternal) grandparents, maternal great-grandmother and maternal great-great grandmother. Although the notice did indicate it was the maternal grandmother, rather than the maternal grandfather, who may be Muscogee (Creek), the notice provided information regarding a maternal great-grandmother— whose last name was the same as the maternal grandfather's and presumably was his mother—as well as the name, date of birth and some form of enrollment information for the great-great grandmother. The Department properly terms its mistake "hyper-

---

[9] Although Sherry did not appeal from the no-ICWA finding originally made on December 6, 2010 until this appeal from the July 6, 2015 order terminating parental rights, the Supreme Court in *In re Isaiah W.*, *supra*, 1 Cal.5th at page 6 held "a parent may challenge a finding of ICWA's inapplicability in an appeal from the subsequent order, even if she did not raise such a challenge in an appeal from the initial order."

17

technical" and correctly insists it would not deprive the tribe of the ability to ascertain whether Christopher was an Indian child within the meaning of ICWA.

Similarly, the Department's omission of the names of other individuals, who may or may not have been relatives of Christopher, did not make the ICWA notice defective. An ICWA notice need only include the child's direct lineal ancestors.  (*In re J.M.* (2012) 206 Cal.App.4th 375, 381; see 25 C.F.R. § 23.111(d)(3) (eff. Dec. 12, 2016) [if known, ICWA notice must contain the names, birthdates, birthplaces, and Tribal enrollment information "of other direct lineal ancestors of the child, such as grandparents"].)  Sherry herself does not know who the omitted individuals are, and there is no indication they are Christopher's lineal ancestors.  In sum, the notices to The Muscogee (Creek) Nation contained all information needed to make them meaningful; any omissions were, at most, harmless error.  (*In re J.M.*, at p. 380; see *In re E.W.* (2009) 170 Cal.App.4th 396, 402-403 ["where notice has been received by the tribe, as it was in this case, errors or omissions in the notice are reviewed under the harmless error standard"].)

> c. *Neither further investigation of Sherry's possible Cherokee ancestry nor notice to the Cherokee Nation was required*

Sherry initially indicated she may have Cherokee, as well as Muscogee (Creek) ancestry.  When she was interviewed by the Department on September 17, 2010, however, Sherry provided details relating only to her possible Muscogee ancestry, supplying the Department's investigator with a partial family tree, and stated she had no further information about her possible Indian ancestry.  Although Sherry now contends the Department did not adequately investigate her possible Cherokee ancestry, she does not affirmatively represent that she has Cherokee ancestry (or even that she has any reason to believe she may) or suggest that further inquiry by the Department would have developed any relevant information on the subject.  It would have been far better practice for the Department to have interviewed other family members to confirm Sherry's initial statement was in error and there were no Cherokee ancestors and to report the absence of such information to the court, to explain why notice had not been provided to the Cherokee tribe as the court had ordered at the arraignment hearing.  Nonetheless, any

18

error in this regard was harmless.  (See *In re H.B*. (2008) 161 Cal.App.4th 115, 122 ["'the rules do not permit [parents] to cause additional unwarranted delay and hardship, without any showing whatsoever that the interests protected by the ICWA are implicated in any way'"]; *In re Rebecca R*. (2006) 143 Cal.App.4th 1426, 1431 [same].)

## DISPOSITION

The juvenile court's July 6, 2015 order is affirmed.


PERLUSS, P. J.


We concur:


ZELON, J.


SEGAL, J.